UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

AMANDA LUCI,

                                        Plaintiff,

                    -against-

THE CITY OF NEW YORK;  JOHN DOE POLICE
OFFICERS ##1-10

                                        Defendants.
-------------------------------------------------------------------- x

**COMPLAINT AND
JURY DEMAND**


ECF CASE

## INTRODUCTION

1.      The New York City Police Department ("NYPD") does not police protests in an unbiased manner.  Rather, the Department makes security and enforcement decisions based on the viewpoints of perceived protesters (and counter-protesters).

2.      Protests promoting viewpoints favored by the NYPD are policed with forbearance.  Officers protect the protesters, and do not make arrests for unlawful behavior, while peaceful counter-protesters are met with police violence and arrests.

3.      Protests promoting points of view disfavored by the NYPD are not protected by officers. They are often met with police violence and arrests.  Violent counter-protesters to disfavored protests are given free rein to harass and assault protesters.

4.      Plaintiff Amanda Luci's presence near the end of a Pro-Palestine protest against Israeli Security Minister Itamar Ben-Gvir -- a point of view disfavored by the NYPD and the City's leadership.  NYPD's practice and tacit policy of policing protests in a way that favors certain points of view and disfavors others caused serious injury to Ms. Luci.

5.      The police officers' actions and inactions were negligent, and violated Ms. Luci's constitutional free speech, due process and equal protection rights.

## JURISDICTION

6.     This action is brought pursuant to 28 USC §1331 and 42 USC §1983. Supplemental jurisdiction of state law claims is asserted.

7.     Venue is laid within the United States District Court for the Eastern District of New York in that the claim occurred within the boundaries of the Eastern District of New York.

## PARTIES

8.     Plaintiff Amanda Luci is a resident of the Crown Heights neighborhood of Brooklyn, New York.

9.     Defendant the City of New York is a municipal corporation organized under the laws of the State of New York.  The New York City Police Department (NYPD) is an agency of the City of New York.

10.     Defendants John Doe ##1-20  were at all times relevant members of the NYPD and were present and played a role in causing her injury and violation of her rights.  They are sued in their individual and official capacities.

11.     At all times here mentioned Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

### ITAMAR BEN-GVIR SPEAKS AT CHABAD HQ

12.     Chabad-Lubavitch is a global Orthodox Hasidic movement within the Jewish religion.  Its world headquarters is located at 770 Eastern Parkway, Brooklyn, NY.

13.     On April 24, 2025, the Chabad Lubavitch World Headquarters hosted Itamar Ben-Gvir where he was expected to speak to a group of supporters.  The headquarters is located at

770 Eastern Parkway, in the Crown Heights section of Brooklyn, New York.

14.     Mr. Ben-Gvir is a notorious supporter of racist terrorist attacks against Palestinians and people of the Islamic faith.

15.     Ben-Gvir founded and leads the Jewish Power party. It is widely described in the international press as an extremist, racist, and Jewish Supremacist political party. The Times of Israel, the country's centrist, largest English language newspaper, stated that Ben-Gvir's party's policies are akin to the neo-Nazi and fascist parties in Europe.

16.     Mr. Ben-Gvir himself has been convicted multiple times of supporting terrorism and racism (all directed against Arab people).

17.     Nevertheless, Prime Minister Benyamin Netanyahu invited him into a governing coalition in 2022 and named him Minister of National Security of Israel.

18.     Last year, Mr. Ben-Gvir called for the ethnic cleansing of Gaza by encouraging Palestinians to "voluntarily" leave the region.  He later advocated withholding aid, including food, to encourage them to leave "voluntarily".

19.     With tensions in New York City high over the Hamas October 7 attack on Israel and the ongoing Gaza War, the Chabad Lubavitch religious organization hosted the divisive, racist Itamar Ben-Gvir to speak at its world headquarters.

20.     Notably, the Chabad Headquarters and community was the epicenter of the "Crown Heights riots" in 1991. A young Orthodox Jewish man from Australia studying in New York, Yankel Rosenbaum, was stabbed and later died of his wounds. Lemrick Nelson, a Black man, was identified and immediately arrested for the crime.

### MS. LUCI AT THE SCENE OF THE PROTEST

21.     Prior to Ms. Luci's arrival, a small group gathered near the Chabad HQ at 770

Eastern Parkway to protest against Minister Ben-Gvir.

22.    The protest gathered where police had set up barricades where the people could protest.

23.    Ms. Luci was at home when she heard a helicopter flying overhead.

24.    Concerned and curious, she left her home to see what was going on.  She was wearing a scarf around her neck.

25.    She proceeded to Eastern Parkway, where she saw a commotion.  It looked to her like it was near the end of a protest.  There were many people who appeared to be connected to Chabad, many police, and a small number of others who appeared to be protesters.

26.    She was looking on and stood near a line of police officers believing this would help to ensure her safety while she observed what was happening.  Indeed, Mayor Adams himself said about this protest that the police were there to "handle a dangerous situation."

27.    A woman who appeared to be connected to Chabad began yelling at the police "She's allowed to stand here and I can't go home?  What's going on get her out of here!"  The woman was addressing Ms. Luci.

28.    As the crowd's attention focused on Ms. Luci, she moved closer to the police line. She relied on their presence and their evident purpose to control the crowd and maintain security. But the City's viewpoint-based policy of restraint towards people communicating favored views denied her of the protection of the numerous police officers present at the scene.

29.    She pulled her scarf up over her face to below her eyes as a mob of men focused on her and began recording her with their phones.  She was surrounded by the mob, and they began yelling vile, violent, and profane insults at her. The men were just inches away from her. One man, believed to be Baruch Elberg, got into her face and said "you want someone to bend

you over and fucking rape you..."  They pointed a strobe light at her face, and they continued to harass her and threaten her with violence.

30.     Though Ms. Luci did not go to the scene to protest, the crowd perceived her to be a protester or otherwise viewed her as sympathetic to the cause of Palestinian rights.  Her scarf, which is not a Palestinian keffiyeh, may have heightened the counter-protesting crowd's belief that she was sympathetic to the Palestinian cause.  The police officers who were present and observing the unfolding dynamic would have perceived the mob to be anti-Palestine and Ms. Luci to be a supporter of Palestinian rights.

31.     The police officers gave her the reasonable impression that they would protect her from crime and violence.  Her reasonable reliance was misplaced.  The line of police officers right next to her did nothing except watch impassively as the mob grew and escalated their threats. They did nothing to even discourage the mob from setting upon Ms. Luci, a lone woman, even though they were already committing the offenses of disorderly conduct, menacing and harassment in their presence, and escalation seemed likely.

32.     For her own safety she decided to leave the area.  Instead of "handling a dangerous situation" and performing the crowd control they were there to do, police officers stood by and allowed the mob to follow her.

33.     The entirely foreseeable escalation of behavior occurred.  As she was trying to get away, the mob followed her, continued their vile threats, but also began assaulting her.  The line of police who were standing by continued to look on impassively, taking no action.

34.     The City's policy of restraint towards people with favorable viewpoints, which plainly manifested in police officers' inaction while offenses were being committed against Ms. Luci, served to embolden the mob.  The City's policy of restraint therefore represented a state-

created danger that endangered Plaintiff and caused her injuries.

35.    One NYPD officer began to walk with her as she was trying to leave the mob behind.  The mob still followed her and continued to assault her.  Though the officer weakly shoved protesters who grabbed on to her, he otherwise did not demand that the crowd stop or take any action to discourage the mob.  No other of the many officers present assisted which only continued to embolden the mob.

36.    The assaults continued until finally, and belatedly, she was ushered to a police car and driven away from the scene.

37.    Plaintiff suffered physical and emotional injuries because of the attack.

38.    Upon information and belief, no one has been arrested for the attack on Ms. Luci despite the fact that the police have video clearly showing the faces of the men that attacked her and the fact that some of the men have been identified by name by concerned members of the community.

39.    This failure to arrest any counter-protesting attacker is just another example of, and was caused by, the City and NYPD's viewpoint biased policing.

### NYPD POLICES PROTESTS BASED ON VIEWPOINT

40.    The City of New York, NYPD and its decisionmakers and policymakers, have a policy and practice of unequal protest policing based on the viewpoint of protesters.  In the instant case, Ms. Luci alleges that NYPD officers permitted, and by their presence encouraged, counter-protesters to assault her and other Pro-Palestine protesters *because* of their point of view regarding Israel and the Gaza War.

### Biased Point of View Training

41.    The training police officers receive exhibits bias in policing protest.  For example,

the NYPD Strategic Response Group ("SRG") is division of NYPD officers dedicated to rapid response to protests.  The SRG instruction manual[1] advises these officers that there are "two different types of crowds": non-violent/compliant and violent/non-compliant.

42.    The instruction manual gives examples of the "violent/non-compliant" crowds, citing "Crown Heights (1991), Occupy Wall Street, BLM Movement, [and] Anti-Trump demonstrations."  Each of the demonstrations is well known to be in support of left-wing causes.[2] that have taken place in New York City, noted below.

43.    The SRG instruction manual was drafted prior to the outbreak of Israel/Palestine protests starting in 2023.  However, other training has singled out Pro-Palestine demonstrators as particularly dangerous, in contrast to the reality of those protests.

44.    In January 2025, the Combat Anti-Semitism Movement ("CAM") – a private pro-Israel anti-Palestinian rights non-profit organization - held a training for NYPD's top brass. NYPD Commissioner Jessica Tisch gave opening remarks.  In the organization's Facebook page, they say: "The training focused on identifying the various forms of antisemitic attacks, understanding radical ideologies fueling these incidents, and equipping law enforcement with the tools to better protect the community."

45.    Preventing antisemitic attacks is certainly a laudable goal. However, it appears that the "training" was much less about preventing violence against Jewish people, instead encouraging police to see protesters with whom they disagree as particularly "dangerous."

---

[1] The manual was published in 2018 and revised and reviewed in 2020.
[2] Occupy Wall Street was a movement in favor of reducing income inequality. BLM stands for "Black Lives Matter".  These were protests against disparate treatment between Black and white people in policing, criminal justice and other societal institutions. Anti-Trump demonstrations protest right-wing Republican President Donald Trump and his Make America Great Again movement." The events that took place in Crown Heights in 1991 were more spontaneous reaction to the killing of a black child by a car driven by Lubavitch-Chabad driver and was, at least in part, motivated by the disparate and more favorable treatment accorded to that Hasidic community in Crown Heights than the Black community.

46.    On September 8, 2025, CAM held a training session for 300 police officers. NYC Deputy Mayor for Public Safety Kaz Daughtry attended and spoke at the event. The police officers there for the training were told by CAM's Interfaith Outreach Coordinator that "red hands" and "globalize the intifada" are "very clear" calls for attacks on Jews and supporters of Israel. These are not calls for attacks on Jews or supporters of Israel, they are political words and actions protected by the core of the First Amendment.[3]

47.    Upon information and belief, the trainings delve further into biased anti-Arab and anti-Palestine propaganda, providing a political training to members of the NYPD to use in their work of policing protests. They forge an understanding in police that Pro-Palestine protesters are antisemitic, extremist and dangerous. For instance, upon information and belief, CAM's trainings have included the following political and racist propaganda:[4]

a. Describing Islam as a "political ideology where Islamic law overrides the law of man."

b.  Stating "Jihadism is a subset of Islam that uses violence to impose Islamic law."

c.  Describing Pro-Palestine supporters as "young, bored and looking for purpose" leading them to extremism.

d.  Describing Pro-Palestine student groups as extremist.

e.  Describing the words "from the river to the sea Palestine will be free" as "antisemitic."

f.  Describes the keffiyeh, a traditional Palestinian headdress, as a symbol of "antisemitism."

g.  Describes the symbol of the watermelon, meant to depict the flag of Palestine under conditions when it is banned, as "antisemitic".

---

[3] Taken on October 2, 2025, from https://combatantisemitism.org/cam-news/cam-law-enforcement-training-program-offers-nypd-officers-lessons-on-identifying-antisemitic-and-extremist-threats/
[4] The allegations that follow appear in a complaint filed in the Southern District of New York, Makkawi et al., v. The City of New York et al., 25-cv-6321 (DEH).  See also https://jewishcurrents.org/training-nypd-keffiyeh-watermelon-antisemitism-israel-palestine, taken on October 3, 2025.

       h.  States the slogan "all eyes on Rafah" – a call for people to not look away from Palestinian suffering – as antisemitic.

48.     The training police officers receive in these sessions and their manuals, as well as likely other sources and direct orders, manifests in biased policing during protests and more importantly, causes to see all Pro-Palestine protesters as a security threat.  Of course, the reality is different.  Multiple studies and government reports show that the dominant threat to the security and safety of Jewish people comes not from Pro-Palestine or proponents of other left-wing causes, but from right-wing extremism.  Despite reality, these sessions train police officers to police Pro-Palestine protesters with greater violence and to allow harm to come to them. Upon information and belief, thousands of NYPD officers have received this training.  The assaults on Ms. Luci are the entirely predictable outcome of these trainings.[5]

49.     The trainings and manuals do nothing to increase the safety of Jewish people. Rather they serve to demonize and squelch legitimate, First Amendment protected speech, and actually cause harm to the many Jewish and non-Jewish people alike who protest for Palestinian rights.

50.     Furthermore, regardless of whether people agree or disagree with CAM's characterizations of Pro-Palestinian words, symbols and actions, these NYPD required trainings unconstitutionally and harmfully promote and/or oppose political viewpoints for police officers to use in their governmental activity of policing protests.

**Biased Policing of Protests Practice**

51.     On October 21, 2023, May 11, 2024, May 18, 2024, August 14, 2024, February 18, 2025, April 28, 2025, and May 8, 2025, pro-Palestine protesters were violently assaulted and

---

[5] *See https://jewishcurrents.org/training-nypd-keffiyeh-watermelon-antisemitism-israel-palestine, taken on October 3, 2025.*

falsely arrested by NYPD police officers.  In an ample warning of what was about to occur on April 24, 2025, NYPD allowed counter-protesters to also attack the protesters at the February 18, 2025 protest.  For brevity and attribution purposes, the detailed allegations in connection with this incident are detailed in a Complaint filed in S.D.N.Y., Makkawi et al., v. City of New York, et al., 25-cv-6231 (DEH) at paragraphs 65-138 and attached herewith.

52.    Yet, in the case of right-wing supporting protesters and counter-protesters, NYPD takes a permissive approach, allowing illegal behavior to go unredressed.  Many older New Yorkers remember the Patrolman's Benevolent Association riot of 1992, when thousands of police officers gathered to protest expanded powers of the Civilian Complaint Review Board and engaged in racist and violent behavior.  The on-duty officers policing the riot refused to enforce or in any way prevent the illegal behavior.

53.    In each of the protests highlighted below, NYPD officers were present.[6]

54.    On October 12, 2018, members of the right-wing extremist group the Proud Boys violently assaulted an anti-fascist protester, kicking and punching him while he was on the ground while screaming "faggot" at him.  At least three SRG police officers stood by and watched without intervening.  When the Proud Boys began walking away from the scene, the police did not follow or even attempt to question them. The next morning, police told reporters there was no investigation into the incident. Only when the video went viral and there was public outcry did NYPD start an investigation. It was later discovered that the Proud Boy founder who was at the scene earlier in the evening brandished an illegal weapon – a sword – on the street in front of police without any intervention or repercussion.[7]  It is little wonder that the Proud Boys

---

[6] These incidents are discussed in greater detail in the attached Makkawi v. City of New York, 25-cv-6321.
[7] https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

founder stated after the incidents "I have a lot of support in the NYPD."

55.     On July 13, 2020, protesters at a Blue Lives Matter protest assaulted and screamed bigoted obscenities at counter-protesters. Blue Lives Matter is a movement that was created after Black Lives Matter to oppose Black Lives Matter.  One protester punched a woman in the face in plain view of the officers.  No protesters were arrested, but two counter protesters were arrested.

56.     On October 7 and 8, 2020, hundreds of members of the ultra-orthodox Jewish community gathered to protest coronavirus restrictions.  Protesters set fires, chased away NYC Sheriff's deputies and attacked a photojournalist.  A counter-protestor was attacked by the crowd and hit with rocks.  No one was arrested.

57.     On October 25, 2020, "Jews for Trump" conducted a rolling caravan and engaged in acts of disorder in New York City streets throughout.  No arrests were made.

58.     On December 2, 2020, protesters gathered to protest covid restrictions on Staten Island.  They blocked traffic but no arrests were made.

59.     Red Rose Rescue, a militant anti-abortion group, routinely march and protest in New York City without being subjected to the arrests and uses of excessive force that left-wing protests, such as Pro-Palestine protests, are subjected to and in fact are protected from counter-protesters.

60.     The above are just examples of the differential treatment accorded to left-wing and right-wing protesters.  Police officers will stand by and watch right-wing protesters and counter-protesters assault left-wing protesters without intervention, which not only violates the constitutional rights of left-wing protesters and those perceived to be such protesters such as Ms. Luci, but actually *causes* these attacks and resulting physical injuries by emboldening right-wing

attackers with the knowledge, that they are supported by onlooking NYPD officers.

61.    Like the Proud Boys, anti-Palestinian rights protesters-cum-attackers know they "have a lot of support inside NYPD".

62.    At all times during the events described above, the Defendant police officers were acting under color of law and within the scope of their employment. The Defendant officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They failed to intervene in the obviously illegal actions of their fellow officers against Plaintiff.

63.    At all times during the events described above, the Defendant police officers were engaged in a joint venture violating Plaintiff's rights.  The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.

64.    During all the events above described, Defendants acted maliciously and with intent to cause injury and harm to Plaintiff and her fellow protesters.

65.    Plaintiff filed written Notice of Claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed of.

66.    This action falls within one or more of the exceptions set forth in CPLR §1602.

## **DAMAGES**

67.  As a direct and proximate result of the acts of defendants, the Plaintiff Amanda Luci suffered the following injuries and damages:

    a.  Violation of her freedom of speech and assembly rights under the First Amendment of the United States

b.  Violation of her right to Due Process of Law under the Fourteenth Amendment to the United States Constitution;

c.  Violation of her equal protection right under the Fourteenth Amendment to the United States Constitution;

d.  Physical pain and suffering;

e.  Emotional trauma and suffering, including fear, emotional distress, frustration, fright, horror, grief, depression, loss of sleep, and increased levels of anxiety; and

f.  Loss of income.

## FIRST CAUSE OF ACTION – 42 U.S.C. § 1983
## VIOLATION OF FIRST AMENDMENT RIGHT TO FREE SPEECH AND ASSOCIATION
### (AS TO ALL DEFENDANTS)

68.    The above paragraphs are here incorporated by reference.

69.    Plaintiff's rights to free speech, expression, assembly, and association were violated due to the acts and omissions alleged herein.

70.    The counter-protesters and the police perceived her to be a protester in favor of Palestinian rights.

71.    By being present but exercising content discriminatory restraint with respect to the counter-protesters and allowing them to harass and assault Plaintiff, the police violated the First Amendment right to freedom of speech, expression and assembly.

72.    As described above, NYPD is trained and practices in viewpoint discrimination in policing protests.  Here, Defendants allowing counter protesters to harass and assault Ms. Luci was discriminatory against her perceived point of view, to wit, Palestinian rights.

73.    Plaintiff suffered damages due to Defendants' violation of her rights.

**SECOND CAUSE OF ACTION -- 42 U.S.C. § 1983**
**VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO BE FREE**
**FROM UNJUSTIFIED INTRUSION OF PERSONAL SECURITY**
(AS TO ALL DEFENDANTS)

74.     The above paragraphs are here incorporated by reference.

75.     The Defendant police officers created a danger to Ms. Luci through following the City policy of restraint towards viewpoint favorable protesters and counter-protesters.  The policy served to embolden the mob of counter-protesters to attack and assault Plaintiff.

76.     By their presence implying authority, their demands of the protesters, and doing nothing to quell the violence of the counter-protesters against the Protesters, The Defendant police officers encouraged the attacks on protesters, including Plaintiff.

77.     The Defendant police officers were deliberately indifferent to the personal security of the protesters, including Plaintiff.

78.     The acts and omissions of the Defendant police officers would shock the conscience of any reasonable observer.

79.     Plaintiff suffered damages due to Defendants' violation of her rights.

**THIRD CAUSE OF ACTION -- 42 U.S.C. § 1983**
**VIOLATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION**
(AS TO ALL DEFENDANTS)

80.     The above paragraphs are here incorporated by reference.

81.     The Defendants' training and practice of policing Pro-Palestine protests in an unsafe, unconstitutional and detrimental manner caused the Defendant police officers to in fact police the above-described protest in such a manner.

82.     The Defendant police officers' failure to police the protest in an equal manner to protests that are viewed as viewpoint favorable to the Defendants caused the Plaintiff to suffer

14

constitutional and physical injury.

83.    Defendants deprived the Decedent of his civil, constitutional and statutory right to equal protection under the Fourteenth Amendment.

84.    Defendants acted with malicious intent, purposefulness and/or deliberate indifference and are liable to plaintiff under 42 U.S.C. §1983.

85.    The Decedent was physically and emotionally injured and has been damaged by Defendants' wrongful acts.

## FOURTH CAUSE OF ACTION – COMMON LAW NEGLIGENCE
### (AS TO ALL DEFENDANT POLICE OFFICERS)

86.    The above paragraphs are here incorporated by reference.

87.    Defendant police officers owed a duty of care to Plaintiff.

88.    Defendant police officers breached that duty when they failed to protect Plaintiff from the obviously foreseeable and repeated actions of her attackers while owing her a duty of care and protection.

89.    The negligence, gross negligence and/or deliberate indifference of Defendant police officers proximately caused the injuries Plaintiff suffered.

90.    The Decedent was physically and emotionally injured and has been damaged by Defendants' wrongful acts.

## FIFTH CAUSE OF ACTION -- 42 U.S.C. § 1983
## MUNICIPAL LIABILITY
### (AS TO DEFENDANT THE CITY OF NEW YORK)

91.    The above paragraphs are here incorporated by reference.

92.    All the acts and omissions of the named and unnamed individual defendants described above were carried out pursuant to policies and practices of the City of New York,

which were in existence at the time of the conduct alleged herein, and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the City.

93.     Defendant the City of New York, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

94.     The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of Defendant City of New York.

95.     The aforementioned customs, practices, procedures, and rules of Defendant City of New York include, but are not limited to, the unconstitutional practices of policing protests based on whether the City favors or disfavors the viewpoint of said protests, causing the violation of constitutional rights and physical and emotional injuries to the protesters expressing disfavored viewpoints.

96.     The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First and Fourteenth Amendments.

97.     As a result of the foregoing, the Plaintiff suffered the injuries and damages alleged herein.

## SIXTH CAUSE OF ACTION
## VIOLATION OF STATE CONSTITUTIONAL RIGHTS
### (AS TO ALL DEFENDANTS)

98.     The above paragraphs are here incorporated by reference.

99.     Defendants, acting under color of law and in the scope of their employment,

violated Plaintiff's rights pursuant to Article 1, §§ 8, 9, and 11 of the New York State Constitution.

100.    A damages remedy is necessary to effectuate the objectives of the aforementioned sections of the State Constitution and to ensure Plaintiff's full realization of said rights.

101.    The acts and omissions of the Defendants were intentional, malicious and/or reckless, and were of such a nature that punitive damages should be imposed against them.

**SEVENTH CAUSE OF ACTION**
**RESPONDEAT SUPERIOR**
(AS TO CITY OF NEW YORK)

102.    The above paragraphs are here incorporated by reference.

103.    Defendants negligent and deliberate acts were undertaken within the scope of their employment by Defendant City of New York, and in furtherance of the Defendant City of New York's interest.

104.    As a result of Defendants' negligent, grossly negligent and deliberately indifferent conduct in the course of their employment and in furtherance of the business of defendant City of New York, plaintiff was damaged.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

A.    In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B.    Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C.    Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:     New York, New York
           November 20, 2025

Yours, etc.,

By:     *Leo Glickman*
        Leo Glickman (LG3644)
        Stoll, Glickman & Bellina, LLP
        5030 Broadway, Ste. 652
        New York, NY 10034
        (718) 852-3710
        lglickman@stollglickman.com

TO:     Defendants